**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

JOHN DAUBERT,

    Plaintiff,

        v.

NRA GROUP, LLC,

    Defendant.

CIVIL ACTION NO. 3:15-CV-00718

(JUDGE CAPUTO)

## MEMORANDUM

Presently before the Court is a Motion for Partial Summary Judgment as to Liability filed by Plaintiff John Daubert ("Plaintiff" or "Daubert"). (Doc. 24.)  In his Complaint, Plaintiff alleges that Defendant NRA Group, LLC ("Defendant" or "NRA") violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* ("FDCPA"), when it mailed him a collection letter that displayed on the envelope a barcode which, when scanned, reveals Plaintiff's account number.  Because I find that there is a genuine issue of material fact as to whether Defendant is entitled to statutory immunity with respect to Plaintiff's FDCPA claim, Plaintiff's motion for summary judgment on this claim will be denied.  Plaintiff also alleges that Defendant violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), when it placed calls to his cellular telephone using an automatic telephone dialing system. Because I find that there is no genuine issue of material fact as to Defendant's violation of the TCPA, Plaintiff's motion for summary judgment on this claim will be granted.

### I. Background

The facts presented in the summary judgment record, viewed in the light most favorable to Defendant, are as follows:

On November 8, 2013, Plaintiff received medical services from Radiology Associates of Wyoming Valley ("Radiology Associates"). (Doc. 32-1, Def. Ex. 1, Radiology Associates Screenshot.) Radiology Associates charged Plaintiff Forty-Six Dollars ($46.00) and Plaintiff's radiology report was forwarded to Medical Billing and Management Services ("MBMS") for coding and billing at some time between November 8, 2013 and November 13, 2013. (Doc. 32-2, Def. Ex. 2, MBMS Affidavit, ¶ 9.)  MBMS provides billing services to Radiology

Associates and is authorized to send billing statements to Radiology Associates' patients and collect unpaid medical bills on their behalf. (*Id.* ¶¶ 2-3.)

In addition to receiving Plaintiff's billing information, MBMS was also provided with Plaintiff's phone number. (*Id.* ¶ 10.) MBMS did not conduct any independent research to obtain Plaintiff's phone number. (*Id.* ¶ 16.) All of the information provided to MBMS was the same as the information that Radiology Associates had in their system. (*Id.* ¶ 15.)

Plaintiff's health insurance company contributed Twenty-One Dollars ($21.00) towards the medical expenses on November 26, 2013, leaving Plaintiff with an unpaid balance of Twenty-Five Dollars ($25.00). (Doc. 32-1, Def. Ex. 1, Radiology Screenshot.) On November 28, 2013, MBMS billed Plaintiff for this outstanding balance, and subsequently sent a reminder statement to Plaintiff on January 11, 2014. (Doc. 32-2, Def. Ex. 2, MBMS Affidavit, ¶ 12.) Plaintiff failed to pay the Twenty-Five Dollar ($25.00) balance, and on April 5, 2014, Plaintiff's account was transferred to Defendant for collection purposes. (*Id.* ¶ 13.) MBMS provided Defendant with Plaintiff's name, address, phone number, account number, and outstanding balance. (*Id.* ¶ 14.) All of the information that MBMS provided to Defendant was exactly the same as the information that it had been provided when it received Plaintiff's account. (Doc. 32-2, Def. Ex. 2, ¶ 15.) In short, Plaintiff's phone number was provided to Defendant when MBMS placed Plaintiff's account with Defendant for collections. (Doc. 24-5, Pl. Ex. D, Anita Schaar Dep., at 44:9-44:12.) Defendant did not conduct any independent investigation to obtain Plaintiff's Phone Number.

On or about April 9, 2014, Defendant's independent letter vendor, Renkim Corporation, mailed Plaintiff a collection letter with a barcode ("the Barcode") printed near Plaintiff's name and address. (Doc. 25, Plaintiff's Statement of Undisputed Material Facts ("PSUMF"), ¶¶ 6-8, 13 (admitted in Doc. 33); *see also* Doc. 24-2, Pl. Ex. A, Redacted Letter dated April 9, 2014.) This letter, which was an attempt to collect a debt, was based on a template that had been approved by Defendant. (Doc. 25, PSUMF, ¶¶ 9-10 (admitted in Doc. 33).) The Barcode was visible through a glassine window in the front of the envelope at the time the letter was mailed and delivered. (Doc. 25, PSUMF, ¶ 16 (admitted in Doc.

2

33); *see also* Doc. 24-3, Pl. Ex. B, Letter in Envelope.)  The Barcode contains no words or phrases, and has an irregular pattern of black and white markings.  (Doc. 24-2, Pl. Ex. A.) When viewed with the naked eye, the Barcode does not reveal any information.  (*Id.*) However, when scanned with a barcode reader specifically designed to read "three of nine" barcodes, Plaintiff's account number is revealed.  (Doc. 33,  Def. Resp. to PSUMF, ¶ 14; Doc. 24-5, Pl. Ex. D, Anita Schaar Dep., at 26:16-20; 39:16-20.)

    As part of its collection efforts, Defendant also placed sixty-nine (69) phone calls to Plaintiff's cellular telephone number.  (Doc. 25, PSUMF, ¶¶ 17-19 (admitted in Doc. 33); Doc. 32-3, Def. Ex. 3, NRA Account Notes.)  Only one (1) of these sixty-nine (69) phone calls was answered by Plaintiff.  (Doc. 33, Def. Resp. to PSUMF, ¶ 48.)  All telephone calls originated in the United States.  (Doc. 25, PSUMF ¶ 46 (admitted in Doc. 33).)  Plaintiff never directly gave Defendant his telephone number, nor did he directly give Defendant consent to receive calls.  (Doc. 25, PSUMF ¶¶ 24-25 (admitted in Doc. 33).)

    Every phone call to Plaintiff was made using Defendant's Mercury Predictive Dialer (the "Dialer").  (Doc. 25, PSUMF ¶ 29 (admitted in Doc. 33).)  The Dialer does not have the capacity to store phone numbers.  (Doc. 24-5, Pl. Ex. D, Anita Schaar Dep. Tr., at 78:4-10.) Phone calls are placed by the Dialer through the use of campaigns, which have criteria that will select which accounts, and thus what phone numbers, the Dialer can access.  (Doc. 25, PSUMF ¶¶ 32-33 (admitted in Doc. 33).)  The creation of these campaigns requires human involvement, namely, they are created by Charlene Sarver, Defendant's Director of Collections.  (Doc. 24-5, Pl. Ex. D, Anita Schaar Dep. Tr., at 57:1-3; *see also* Doc. 32-4, Def. Ex. 4, Charlene Sarver Affidavit [hereinafter "Sarver Affidavit"], ¶ 1.)

    On March 13, 2015, Plaintiff initiated the instant action by filing a Complaint asserting violations of the FDCPA against Defendant in the Commonwealth of Pennsylvania, Court of Common Pleas of Luzerne County, Civil Action, Case No. 2015-01734.  (Doc. 2.)  On April 13, 2015, Defendant removed this case to federal court.  (Doc. 1.)  On October 2, 2015, Plaintiff filed an Amended Complaint, adding a claim for a violation of the TCPA.  (Doc. 22.) On October 8, 2015, Defendant filed an Answer, which included a "prior express consent"

affirmative defense to Plaintiff's TCPA claim.  (Doc. 23.)  On April 6, 2016, Defendant filed an Amended Answer, which added an affirmative defense of statutory immunity to Plaintiff's FDCPA claim.  (Doc. 44.)  On December 2, 2015, Plaintiff moved for partial summary judgment as to liability on both his FDCPA and TCPA claims.  (Doc. 24.)  This motion has been fully briefed and is now ripe for disposition.

## II. Discussion

### A.    Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)).  A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law.  *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996).  Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one.  *Anderson*, 477 U.S. at 247-48.  An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248.  Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law.  *See Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010).  The moving party may present its own evidence or, where the non-moving party has the burden of proof, simply point out

to the court that "the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When considering whether there are genuine issues of material fact, the court is required to "examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

In order to prevail on a motion for summary judgment, the non-moving party must show "specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)). Although the non-moving party's evidence may be either direct or circumstantial, and "need not be as great as a preponderance, the evidence must be more than a scintilla." *Id*. (quoting *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. There is no issue for trial unless there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Id.*

## C.   Fair Debt Collection Practices Act

To prevail on an FDCPA claim, a plaintiff must prove that (1) she is a consumer; (2)

the defendant is a debt collector; (3) the defendant's challenged practice involves an attempt to collect a "debt" as defined by the Act; and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt. *Douglass v. Convergent Outsourcing*, 765 F.3d 299, 303 (3d Cir. 2014) (citation omitted). Here, only the fourth element is at issue–whether Defendant violated section 1692f of the FDCPA in attempting to collect Plaintiff's debt.

### 1.    The Barcode

Section 1692f of the FDCPA prohibits a debt collector from "[u]sing any language or symbol, other than the debt collector's address, on any envelope when communicating with a consumer by use of the mails or by telegram, except that a debt collector may use his business name if such name does not indicate that he is in the debt collection business." 15 U.S.C. § 1629f(8). Plaintiff alleges that Defendant violated this provision when they mailed him a collection notice with a Barcode that was visible through the glassine window of the envelope which, when scanned, would reveal Plaintiff's account number.

The purpose of section 1692f is two-fold: (1) to prevent debt collectors from using harassing and embarrassing language on collection envelopes to coerce payment; and (2) to protect a debtor's private financial information. *Douglass*, 765 F.3d at 306. Although Defendant's display of the Barcode violates the plain language of the statute, Defendant argues that because it was neither harassing nor embarrassing, and when viewed with the naked eye, did not disclose any private financial information, summary judgment for Plaintiff should be denied.

The parties' dispute over this claim largely revolves around their competing interpretations of a Third Circuit opinion addressing this issue, *Douglass v. Convergent Outsourcing*, 765 F.3d 299 (3d Cir. 2014). In *Douglass*, the consumer alleged that the debt collector violated the FDCPA when it (1) printed the consumer's account number on a portion of the collection letter that was visible through the envelope window; and (2) included a QR

code[1] that was also visible through the envelope window and which, when scanned, displayed personal information about the consumer.  The district court granted summary judgment in favor of the debt collector, adopting a "benign language" exception that some other courts have similarly adopted, and holding that because "exposure of this account number on the envelope and through the QR code is benign," there was no violation of the FDCPA.  *Douglass v. Convergent Outsourcing*, 963 F. Supp. 2d 440, 447 (E.D. Pa. 2013), *vacated*, 765 F.3d 299 (3d Cir. 2014) (emphasis added).

The consumer appealed, abandoning her argument that the QR Code display violated the FDCPA, but appealing the order regarding the disclosure of her naked account number. In defense of the district court order, the debt collector argued that strictly construing Section 1692f(8) would create an "absurdity" because it would prevent a debt collector from ever sending any collection letter, as "the envelope could not display the name and address of the recipient or even a stamp without violating the FDCPA."  *Douglass*, 765 F.3d at 303. Thus, the debt collector asked the court to adopt a "benign language exception . . . that would allow for markings on an envelope so long as they do not suggest the letter's purpose of debt collection or humiliate or threaten the debtor."  *Id.*

The Third Circuit reversed the order granting summary judgment for the defendant debt collector.  *Douglass*, 765 F.3d at 302.  The Third Circuit chose not to decide whether or not to adopt a benign language exception, but instead held that "even if such an exception existed, [the consumer's] account number is not benign."  *Id.* at 303.  In reversing the district court order, the court explained that the disclosure of an account number "implicates a core concern animating the FDCPA–the invasion of privacy":

> The account number is a core piece of information pertaining to Douglass's status as a debtor and Convergent's debt collection effort.  Disclosed to the public, it could be used to expose her financial predicament.  Because Convergent's disclosure implicates core privacy concerns, it cannot be deemed benign.

---

[1]      "QR code" is an abbreviation for Quick Response Code, which is a type of a barcode.

*Id.* at 303-04.

Finally, in rejecting the debt collector's argument that the "account number is a meaningless string of numbers and letters, and its disclosure has not harmed and could not possibly harm [the consumer]," the court held that the "account number is not meaningless–it is a piece of information capable of identifying Douglass as a debtor.  And its disclosure has the potential to cause harm to a consumer that the FDCPA was enacted to address."  *Id.* at 305.  Accordingly, the court held that the display of the consumer's account number on the envelope of the collection letter violated Section 1692f(8).  *Id.* at 305-06 ("Douglass's account number is impermissible language or symbols under § 1692f(8).").

Plaintiff maintains that *Douglass* is controlling here, and that the only factual distinction between the instant matter and *Douglass* is that here, the account number is embedded in a barcode and can only be revealed with a scanner, whereas in *Douglass*, the account number was visible to the naked eye.  In arguing that this distinction is irrelevant, Plaintiff relies on four (4) post-*Douglass* cases decided within this Circuit, which have held that *Douglass* extends to account numbers that are not naked, but that are instead embedded within a barcode.  Relying on these opinions, Plaintiff seeks summary judgment.

First, Plaintiff notes that Judge Nealon has twice held that including an account number in a barcode that is visible through the glassine window of an envelope may form the basis for an FDCPA violation.  *See Styer v. Prof'l Med. Mgmt., Inc.*, 114 F. Supp. 3d 234, 243 (M.D. Pa. 2015) (granting the debtor's motion for summary judgment because "the disclosure of the QR code constitutes a violation of the FDCPA as a matter of law"); *Kostik v. ARS Nat'l Servs., Inc.*, No. 3:14-cv-2466, 2015 WL 4478765, at *1 (M.D. Pa. July 22, 2015) (following *Styer* and denying the debt collector's motion for judgment on the pleadings).  In *Kostik*, Judge Nealon rejected the debt collector's motion to certify an interlocutory appeal to the Third Circuit because there was not a substantial ground for difference of opinion as to the Court's earlier order, which held that including a visible barcode on a collection letter violated the FDCPA, and noting that the debt collector was unable to cite to one post-*Douglass* decision within the Third Circuit in support of their

position. *See Kostik v. ARS Nat'l Servs., Inc.*, No. 3:14-cv-2466, 2016 WL 69904, at *2-*4 (M.D. Pa. Jan. 5, 2016). Three (3) other courts within this Circuit have reached the same conclusion as Judge Nealon. *See Park v. ARS Nat'l Servs., Inc.*, No. 15-2867, 2015 WL 6579686, at *1 (D.N.J. Oct. 30, 2015) (Wigenton, J.) (denying the debt collector's motion for judgment on the pleadings based on the display of a barcode containing the plaintiff's account number); *Pirrone v. NCO Fin. Sys., Inc.*, No. 2:15-cv-4000, 2015 WL 7766393 (E.D. Pa. Nov. 30, 2015) (Beetlestone, J.) (same); *Link v. ARS Nat'l Servs., Inc.*, No. 15-cv-643, 2015 WL 8488674 (W.D. Pa. Nov. 2, 2015) (Mitchell, M.J.), *report and recommendation adopted*, No. 15-643, 2015 WL 8271651 (W.D. Pa. Dec. 8, 2015) (Bissoon, J.) (same). Accordingly, Plaintiff urges that this Court follow *Styer* and hold that "allowing Defendant to disclose Plaintiff's identifying information to the public, even if such information is embedded in a [bar]code, would run afoul of . . . the FDCPA." *Styer*, 114 F. Supp. 3d at 243.

Defendant does not address any of these cases. Instead, it argues that Plaintiff mischaracterizes *Douglass* and that the holding in *Douglass* was rather limited. Specifically, Defendant argues that *Douglass* only addressed whether an account number visible to the naked eye violated the FDCPA, and never addressed whether a barcode also violated the FDCPA. *Douglass* affirmatively declined to address the issue, and refused to consider whether the QR code on the plaintiff's collection letter should be held to the same standard as the account number. *Douglass*, 765 F.3d at 301, n.4 ("Douglass no longer presses her argument that Convergent violated the FDCPA by including the QR Code on the envelope . . . We therefore do not decide that issue."). Defendant claims that *Douglass* refused to overrule *Waldron v. Prof'l Med. Mgmt.*, No. 12-1863, 2013 WL 978933 (E.D. Pa. Mar. 13, 2013), which held that the presence of a barcode did not violate the FDCPA, and that therefore, *Waldron* is still good law in the Third Circuit. *Id.* at *5 ("[T]he embedded data is a seemingly random series of letters and numbers that only [the debt collector] can decipher."). In refusing to overrule *Waldron*, Defendant argues that the Third Circuit left open the possibility that even in a *Douglass* jurisdiction, district courts could still find that barcodes do not violate the FDCPA. Defendant argues that this distinction is important

9

because *Douglass* never discussed whether a barcode implicates the same type of privacy concerns that the Third Circuit talked about in terms of an account number.  Here, the Barcode at issue provides no information when viewed without a device specially equipped to read the type of barcode used on the envelope.

However, Defendant's view is misguided.  In acknowledging *Waldron*, the Third Circuit did not explicitly refuse to address the issue of barcodes.  Rather, the Third Circuit simply acknowledged that some district courts, such as the Eastern District of Pennsylvania in *Waldron*, adopted "benign language exceptions."  *Douglass*, 765 F.3d at 304 n.6.  The Third Circuit did not affirm *Waldron*'s holding that the barcode did not violate the FDCPA, but simply said it would not be ruling on whether or not there was a benign language exception as discussed in *Waldron*, since even if there were, it would not apply to the naked display of personal account information.  *Id.* at 303-04.

Defendant also relies on other out-of-district cases that have come to the same conclusion as *Waldron*.  For example, in *Gonzalez v. FMS, Inc.*, the Northern District of Illinois held that even if *Douglass* was binding, it would not extend to an account number that was embedded into a random string of numbers.  *Gonzalez v. FMS, Inc.*, No. 14-9424, 2015 WL 4100292 (N.D. Ill. July 6, 2015) (holding that a third party "viewing the envelope could not plausibly divine that the letter inside was associated with a delinquent debt").  The court distinguished between words and symbols that on their face disclosed sensitive information, and those that were hidden from view.  *Id.* at *5.  Thus, Defendant argues that it is inappropriate to apply *Douglass*' analysis to a barcode.  *See also Perez v. Global Credit & Collection, Corp.*, No. 14-civ-9413, 2015 WL 4557064 (S.D.N.Y. July 27, 2015) (granting motion to dismiss FDCPA claim where debt collector's envelope displayed the consumer's account number because "a string of eight meaningless digits falls comfortably within the 'benign language' exception to § 1692f(8)").  *Id.* at *3.  However, none of these opinions are controlling authority in this matter, particularly since they all assumed there was a benign language exception to the FDCPA, which the Third Circuit has not yet adopted.

Defendant further argues that under Plaintiff's logic, a debt collector's return

address–"text that is expressly allowed by § 1694f(8)–is equally capable of identifying the recipient as a debtor." *Gardner v. Credit Mgmt LP*, No. 14-9414, 2015 WL 6442246, at *5 (S.D.N.Y. Oct. 23, 2015). All that a sufficiently interested party would need to do is search the return address in an internet search engine and the name of the debt collector would appear. *Id.* "If the Act were concerned with the display of information that ***could***, if diligently investigated, disclose a recipient's debtor status, it would not permit return addresses . . . at all." *Id.* Defendant argues that the FDCPA is concerned with the information ***itself*** that is included on the collection envelope, not what third parties could learn if investigated. To be sure, the FDCPA distinguishes between debt collector names that on their face indicate a collection purpose, and those that do not. *See* 15 U.S.C. § 1692f(8) (" . . . except that a debt collector may use his business name if such name does not indicate that he is in the debt collection business."). Defendant maintains that the FDCPA would not make this distinction if it was concerned with what third parties could learn if they researched the business name. Defendant analogizes the Barcode here, which on its face reveals no information, to the return address or business name of the debt collector that does not reveal that the sender is in the debt collection business. It is only after the barcode is scanned that the recipient's account number is revealed, which Defendant argues makes it substantially different than the account number in *Douglass*. On the one hand, you have an account number, which the Third Circuit has held to be "a core piece of information pertaining to Douglass's status as a debtor and Convergent's debt collection effort." *Douglass*, 765 F.3d at 303. On the other hand, you have a barcode that to the naked eye appears as only a black and white rectangle, revealing nothing about the recipient's status as a debtor.

Defendant's position is not consistent with *Douglass*. Defendant relies heavily on the argument that the Barcode at issue here, "on its face" reveals no information, and that personal information is only revealed when a third party steps in and scans the Barcode. However, in *Douglass*, the Third Circuit emphasized the "***potential*** to identify the debtor and her debt," not just whether the markings at issue "on its face" or to the "naked eye" revealed any identifying information. *See, e.g.*, *Douglass*, 765 F.3d at 303 ("The account number is

a core piece of information pertaining to Douglass's status as a debtor and Convergent's debt collection effort.  Disclosed to the public, it *could* be used to expose her financial predicament.") (emphasis added); *id.* at 304 (distinguishing other out-of-district cases where courts permitted an exception for seemingly benign markings because "they did so in the context of envelope markings that *did not have the potential* to cause invasions of privacy"); *id.* at 305 (distinguishing cases where markings were found to fall within the benign exception because they "did not confront an envelope that displayed core information relating to the debt collection and *susceptible* to privacy intrusions") (emphasis added).  The Third Circuit was quite explicit in holding that Douglass' account number "is not meaningless" because it is a "piece of information *capable* of identifying Douglass as a debtor.  And its disclosure has the *potential* to cause harm to a consumer that the FDCPA was enacted to address."  *Id.* at 305-06.  Therefore, the Third Circuit held that the dispositive issue was not whether the marking at issue "on its face" revealed identifying information, but whether the marking was "*capable*" of doing so.  *Id.* at 306 (reiterating that the FDCPA "must be broadly construed in order to give full effect to [Congress's remedial] purposes").

Here, it is undisputed that the Barcode is *capable* of identifying Plaintiff as a debtor.  When scanned, the Barcode reveals Plaintiff's account number, which is "core information" that must be protected.  *Id.* at 305.  Accordingly, there is no genuine issue of material fact as to whether Defendant's display of the Barcode violated the FDCPA.  Plaintiff's Motion for Partial Summary Judgment as to liability on his FDCPA claim will be granted unless Defendant can establish that it is entitled to any affirmative defenses to this claim.

### 2.   Statutory Immunity

Here, Defendant invokes the statutory immunity defense.[2]  The FDCPA provides debt

---

[2]     On April 4, 2016, Plaintiff and Defendant submitted a Stipulation permitting Defendant to file an Amended Answer asserting this affirmative defense as well as a sur-reply to Plaintiff's Motion for Partial Summary Judgment to argue the applicability of this new defense.  (Doc. 39.)  Plaintiff consented to these filings, provided that (1) the Amended Answer would not be deemed to moot Plaintiff's Motion for Partial Summary Judgment; (2) Plaintiff would be given an

collectors with statutory immunity for FDCPA violations if the violation was not intentional "and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c). Here, Defendant argues that when their independent letter vendor mailed Plaintiff the collection letter on April 9, 2014, every court that addressed the issue–including two (2) district courts in Pennsylvania–had found that the presence of a barcode on the outside of a collection notice did not violate the FDCPA. Defendant asserts that even if I find that the presence of the Barcode violates the FDCPA, the violation was accidental, and that imposing liability on Defendant will have the practical effect of retroactively punishing Defendant for following the law as it then stood. At the very least, Defendant argues that a triable issue of fact exists as to whether Defendant's violation was a "bona fide error."

To invoke statutory immunity under the FDCPA, Defendant must show that (1) the alleged violation was unintentional; (2) the alleged violation resulted from a bona fide error; and (3) the bona fide error occurred despite procedures designed to avoid such errors. *Beck v. Maximus, Inc.*, 457 F.3d 291, 2978-98 (3d Cir. 2006). Although the bona fide defense does not apply to "mistaken interpretations of the FDCPA," *see Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, L.P.A. et al.*, 559 U.S. 573, 578 (2010), district courts have distinguished between an interpretation of law (which *Jerman* held was not covered by the bona fide error defense) and an unsettled issue of law, which is entitled to statutory immunity, *see Gray v. Suttell & Assocs.*, 123 F. Supp. 3d 1283 (E.D. Wash. Aug. 12, 2015).

In *Gray*, the defendant debt collector attempted to collect on a debt that the plaintiff claimed was outside the statute of limitations. The district court granted the defendant's

---

opportunity to investigate the factual allegations raised in the new affirmative defense; and (3) Plaintiff would be permitted to file a brief responding to Defendant's sur-reply. (*Id.* at 1-2.) On April 5, 2016, I entered an Order approving the Stipulation, and on April 6, 2016, Defendant filed both a sur-reply (Doc. 42) and an Amended Answer (Doc. 44), both of which assert that even if Defendant violated the FDCPA, it is entitled to statutory immunity. Plaintiff did not file a response.

motion for summary judgment, finding that the defendant was immune from liability under the bona fide error defense where it misinterpreted state law–not the FDCPA–and where the applicable limitations period had not been provided by the state legislature or resolved by the state courts. *See also Jarzyna v. Home Props, L.P.*, 114 F. Supp. 3d 243, 267 (E.D. Pa. 2015) (holding that the bona fide error defense applied to mistaken interpretations of a lease agreement in an FDCPA action); *Watkins v. Peterson Enters.*, 57 F. Supp. 2d 1102, 1107-08 (E.D. Wash. 1999) (holding that the defendant was entitled to rely on the bona fide error defense where its mistaken view of the law had been approved by state district courts); *Simmons v. Miller*, 970 F. Supp. 661, 664 (S.D. Ind. 1997) (holding that collectors who did not knowingly file time barred suit did not violate FDCPA and explaining that there was no liability where neither the state legislature nor the state supreme court had pronounced the applicable statute of limitations); *West v. Check Alert Sys.*, No. 1-860, 2001 WL 1699196, at *4-*7 (W.D. Mich. Sept. 7, 2001) (holding that the bona fide error defense was available because the defendant complied with state law).

Here, Defendant argues that all three (3) elements of a bona fide error defense are satisfied. Specifically, Defendant emphasizes that its decision to mail the notice with a Barcode was based on holdings of district courts that had specifically approved of the practice at the time. *See, e.g.*, *Waldron v. Prof'l Med. Mgmt.*, No. 12-1863, 2013 WL 978933, at *5 (E.D. Pa. Mar. 13, 2013) ("The embedded data is a seemingly random series of letters and numbers that only Defendant can decipher. Its inclusion on the envelope's face thus does not violate the Act.'); *Douglass v. Convergent Outsourcing*, 963 F. Supp. 2d 440, 447 (E.D. Pa. 2013) ("Since exposure of this account number on the envelope and through the QR code is benign, § 1692f(8) is not violated."); *see also Marx v. Gen. Revenue Corp.*, 668 F.3d 1174, 1177 (10th Cir. 2011) (holding that the mere presence of an account number does not show that the communication is related to a debt collection). Notably, at the time the decision to send the envelope was made, Defendant asserts that there was not a single court in the country that had found that the Barcode would have violated the FDCPA. The Third Circuit Court of Appeals issued their opinion in *Douglass* on August 27,

2014, four (4) months after mailing Plaintiff's collection notice.

Additionally, Defendant asserts that it has adopted procedures to ensure that it is in compliance with the most up-to-date case law. (Doc. 43, Ex. 1, Ashley Chille Affidavit.) Ashley Chille, Defendant's Director of Legal and Compliance, reviews case law nationwide to familiarize herself with any changes to the FDCPA. (*Id.* ¶ 3.) When the *Waldron* and *Douglass* opinions were released, she reviewed these decisions and, after discussions with NRA's management, determined that there was no reason to change the location of the Barcode on NRA's collection notices, especially in Pennsylvania, where these two (2) courts sat. (*Id.* ¶¶ 9, 12, 13.)

Viewing the evidence in the light most favorable to Defendant, a reasonable juror could conclude that (1) Defendant had procedures in place to review current case law and adopt its collection practices to any new developments; (2) relying on that case law, Defendant directed its letter vendor to mail Plaintiff a collection notice on April 9, 2014 that included the Barcode; and (3) to the extent that the Barcode violated the FDCPA, it was unintentional. Defendant has presented a genuine issue of material fact as to whether it is entitled to statutory immunity with regard to Plaintiff's FDCPA claim. Accordingly, Plaintiff's Motion for Partial Summary Judgment on this claim will be denied.

## D.   Exclusion of Evidence

Before moving onto the merits of Plaintiff's TCPA claim, I must first address two (2) evidentiary issues raised by Plaintiff relating to his TCPA claim. In his Reply Brief, Plaintiff objects to Defendant's reliance on two documents: (1) an affidavit by a third party, MBMS (Doc. 32-2, Def. Ex. 2, "MBMS Affidavit"), and (2) an affidavit submitted by Defendant's Director of Collections, Charlene Sarver (Doc. 32-4, Def. Ex. 4, "Sarver Affidavit"). Both of these will be discussed below.

### 1.   The MBMS Affidavit

In support of its "prior express consent" defense, Defendant attached the MBMS Affidavit as an exhibit to its opposition to Plaintiff's Motion for Partial Summary Judgment. (Doc. 32-2, Def. Ex. 2.) This was filed on January 7, 2016. Because this affidavit is the first

15

time that Defendant had disclosed the existence of MBMS to Plaintiff, Plaintiff argues that this affidavit should not be considered by this Court and should be excluded from evidence. (Doc. 37, Pl. Reply, at 1-6.)  Specifically, Plaintiff maintains that Defendant should have disclosed the identity of MBMS pursuant to its obligations under Rule 26 as well as in its responses to Plaintiff's interrogatories, which required Defendant to "[i]dentify every person with factual information relevant to this case."  (Doc. 37-2, Def. Resp. to Pl.'s Interrog. & Request for Documents, at 5.)

Defendant was not required to identify MBMS in its initial Rule 26 disclosures or in response to Plaintiff's interrogatories.  Defendant's responses were filed on June 11, 2015, which was before Plaintiff asserted his TCPA claim.  (Doc. 37-2, at 12.)  Plaintiff concedes "that MBMS only has information relevant to Plaintiff's claim under the Telephone Consumer Protection Act." (Doc. 37, at 2 n.1.)  Plaintiff did not assert a TCPA claim until his Amended Complaint, which was filed on July 28, 2015, and docketed on October 2, 2015.  (Doc. 22.)  Any obligation Defendant had to disclose MBMS did not arise until after the Amended Complaint was filed.  Because Defendant's discovery responses to Plaintiff's interrogatories were submitted before the Amended Complaint was filed, *i.e.*, before Defendant was on notice of Plaintiff's TCPA claim, it was not obligated to disclose MBMS at that time.

However, parties have an ongoing obligation to supplement its disclosures.  *See generally* Fed. R. Civ. P. 26.  A party who has made a disclosure under Rule 26(a) or who has responded to an interrogatory must supplement or correct its disclosure or response "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A).  "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  However, this sanction is not required under the Rules.  *See* Fed. R. Civ. P. 37(c)(1) ("In addition to or *instead* of this sanction, the court, on motion and after giving an opportunity to be heard . . . may impose other appropriate sanctions.").

16

The exclusion of evidence for violation of a party's discovery obligations is an "extreme sanction." *In re TMI Litig.*, 193 F.3d 613, 721 (3d Cir. 1999). The Third Circuit has articulated at least five (5) factors for courts to consider when determining if evidence should be excluded:

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified; (2) the ability of that party to cure the prejudice; (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court; and [sic] (4) bad faith or willfulness in failing to comply with the district court's order; [sic] (5) the importance of the testimony or evidence to the party seeking its admission.

*Total Containment, Inc. v. Dayco Prods., Inc.*, 177 F. Supp. 2d 332, 341 (E.D. Pa. 2001); *see also In re TMI Litig.*, 193 F.3d 613, 721 (listing the first four factors); *Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 302 (3d Cir. 1991) (adding that "the importance of the excluded testimony" is another "one of the factors to be considered").

Here, Plaintiff argues that a review of these factors demonstrates the appropriateness of exclusion. I disagree. Although I agree that the "surprise" element in the first factor weighs in favor of exclusion since Defendant's opposition to Plaintiff's Motion for Partial Summary Judgment was the first time that Plaintiff and his counsel had ever heard of MBMS, I do not find that there is sufficient prejudice to justify exclusion. Defendant's opposition was filed in January, 2016, which gave Plaintiff plenty of time to notify Defendant and this Court if he wanted to seek additional discovery on MBMS and any other related information.

Additionally, I find that the second factor–the ability of Defendant to cure any prejudice–weighs in favor of Defendant, because Plaintiff was notified of the information that MBMS had related to this case as outlined in their affidavit, and if he believes that additional information is required, he could have and still may request leave from this Court to re-open discovery and depose MBMS or seek any other information he believes is necessary.

Third, Plaintiff argues that reopening discovery would likely disrupt the orderly and efficient trial of the case, since he would have less than two (2) months to conduct third-party discovery. I disagree. Defendant submitted any information that MBMS may have had that

was relevant to this case through their affidavit (Doc. 32-2, Ex. 2), and should Plaintiff require additional information, he has sufficient time to schedule a deposition or request additional interrogatories or discovery documents.  If, for some reason, at any time, Plaintiff feels that taking additional discovery is necessary but would prejudice his ability to prepare for trial, he may seek leave from this Court to discuss a re-scheduling of deadlines.

Fourth, Plaintiff does not have any evidence to demonstrate that Defendant acted in bad faith.  Plaintiff argues that Defendant has known since July 28, 2015, that Plaintiff wished to add a TCPA claim to his Complaint, and that Plaintiff's Amended Complaint was on file for over three (3) months before MBMS' identity was made known.  However, absent any additional evidence, this could simply be evidence of negligence, not bad faith.

The fifth factor, the importance of the information to the proffering party, weighs strongly in favor of Defendant.  The MBMS Affidavit plays a significant role in Defendant's argument relating to its "prior express consent" defense.

Because I find that a majority of the factors weigh in favor of admitting Defendant's evidence relating to MBMS, I do not find that under the circumstances here, the "extreme sanction" of exclusion is justified.  *In re TMI Litig.*, 193 F.3d 613, 721 (3d Cir. 1999). Accordingly, I will consider the MBMS Affidavit.  Should Plaintiff feel the need to re-open discovery, Plaintiff may seek leave from this Court to do so.  *See, e.g.*, *Total Containment, Inc.*, 177 F. Supp. 2d at 341 (rejecting argument for excluding evidence pursuant to Rule 37 and explaining that "to the extent Dayco feels that it will be prejudiced by the short time left for discovery, it may file any appropriate motions.").[3]

---

[3]     Plaintiff also notes that the identity of Charlene Sarver, from whom Defendant submitted an affidavit in connection with its summary judgment briefing (Doc. 32-4, Def. Ex. 4), was not disclosed pursuant to Rule 26(a)(1) or in response to Plaintiff's discovery requests.  However, Plaintiff concedes he was on notice of Charlene Sarver after the Rule 30(b)(6) deposition of Anita Schaar, who mentioned Charlene Sarver during the deposition and discussed her role in relation to the Dialer.  (Doc. 37, at 6 n.4; *see also* Doc. 24-5, Pl. Ex. D, Anita Schaar Dep. Tr., at 17:2-15; 57:1-10; 61:1-5.)

### 2.   The Sarver Affidavit

Next, Plaintiff asserts that Defendant is bound by the testimony provided by its Rule 30(b)(6) designee, Anita Schaar ("Schaar"), and that any attempt to contradict Schaar's testimony through the Sarver Affidavit should be rejected.  I agree.

Here, Plaintiff sought to obtain binding testimony from Defendant by serving a Rule 30(b)(6) deposition notice, which specifically described several topics at issue, including "[e]ach system used by Defendant to place telephone calls to third parties" and "[e]ach system used by Defendant that can place a telephone call using an artificial or a prerecorded voice."  (Doc. 37-3, Pl. Ex. C, Deposition Notice, ¶¶ 21, 24.)  Defendant designated Anita Schaar, NRA's Director of Payment Processing and Internal Controls.  In her deposition, Schaar testified that she had reviewed all of the topics and definitions contained within the deposition notice and that she was able to testify about all of them.  (Doc. 24-5, Pl. Ex. D, Anita Schaar Dep. Tr., at 15:4-21.)  Although Schaar initially testified that she did not think that there was anything else she could have done to prepare for the deposition, she later stated that she could have spoken with her co-worker Charlene Sarver, who might have more "technical information" about the Dialer.  (*Id.* at 16:23-17:15.)  At the end of her deposition, Schaar confirmed that she believed that she was able to answer all of the questions "fully and accurately."  (*Id.* at 86:11-17.)

In support of his argument that the Dialer involves no human intervention and is therefore an automatic telephone dialing system ("ATDS"), Plaintiff relies on Schaar's deposition testimony, where she testifies that the only human intervention involved with a call placed by the Dialer is the creation of a campaign (which determines what numbers to call) and that if a phone call is not answered by a debtor, no NRA employee is ever involved in the phone call:

> Q.   Okay.  So how is a phone call placed through the dialer system?
> A.   There is a campaign created.
> Q.   And this is the type of campaign that Charlene would create?
> A.   Yes.
>         . . .
> Q.   Okay.  So a human being selects the campaign criteria but then the dialer actually places the phone call?

19

A. Correct.

Q. Okay.  When does an employee of NRA first get involved in a phone call that's been placed?

A. When someone answers the phone.

Q. Okay.  So if an individual does not answer a phone call, an employee of NRA never is associated with that phone call?

A. Repeat that question.

Q. Sure.  If a phone call is not answered by a debtor, is an NRA employee ever involved in that phone call?

A. No.

(Doc. 24-5, Pl. Ex. D, Anita Schaar Dep. Tr., at 60:23-61:3; 69:1-15.)  This is inconsistent with the Sarver Affidavit, wherein Sarver states that "[t]he Dialer is not capable of making phone calls without human intervention" and that "multiple levels of human intervention are required." (Doc. 32-4, Def. Ex. 4, Sarver Affidavit, ¶¶ 10-11.)  Other contradictory statements include Sarver's assertion that "[o]nce the campaign is set up, the Dialer is incapable of carrying out the telephone campaign without further human intervention" and that "[a]t the second level of human intervention, an individual collector is required to hit the 'F4' key on a keyboard before any phone call is processed."  (*Id.* ¶¶ 16, 17, 20-21, 24.)  These statements all contradict Schaar's testimony that there is no other human involvement besides the creation of the campaign.

A party may not retract prior 30(b)(6) testimony with a later affidavit, and then use that affidavit to preclude summary judgment. *State Farm v. Mut. Auto. Ins. Co. v. New Horizont, Inc.*, 250 F.R.D. 203, 212 (E.D. Pa. 2008).  Where the nonmovant in a motion for summary judgment submits an affidavit that directly contradicts an earlier Rule 30(b)(6) deposition and the movant relied upon and based its motion on the prior deposition, several courts have disregarded the later affidavit.  *Id.* (citing cases); *see also Rainey v. Am. Forest & Paper Ass'n, Inc.*, 26 F. Supp. 2d 82, 95 (D.D.C. 1998) ("[T]he Kurtz affidavit's quantitative assertion works a substantial revision of defendant's legal and factual positions.  This eleventh hour alteration is inconsistent with Rule 30(b)(6), and is precluded by it.").  However, where the affidavit is "accompanied by a reasonable explanation" of why it was not offered earlier, courts have allowed a contradictory or inconsistent affidavit to nonetheless be admitted to supplement the earlier-submitted Rule 30(b)(6) testimony.  *State Farm Mut.*

*Auto. Ins. Co.*, 250 F.R.D. at 213 (citation and internal quotation marks omitted).

This principle of summary judgment practice, commonly referred to as the "sham affidavit doctrine," has been discussed by the Third Circuit.  In *Jiminez v. All Am. Rathskellar, Inc.*, 503 F.3d 247 (3d Cir. 2007), the Third Circuit explained that they have previously "held that a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict."  *Id.* at 251 (citation and internal quotation marks omitted) (detailing several courts' treatment of the sham affidavit doctrine).  "A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant."  *Id.* at 253.

However, the Third Circuit also clarified that they "have adopted a more 'flexible' approach" to the sham affidavit doctrine than some other courts.  *Id.* at 254.  Specifically, the Third Circuit has observed that "not all contradictory affidavits are necessarily shams."  *Id.* (citing *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004)).  Instead, when there is "independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit."  *Id.*  Such corroborating evidence may establish that the affiant was "understandably" mistaken, confused, or not in possession of all the facts during the previous deposition.  *Id.*  Additionally, the Third Circuit has also held that an affiant has the opportunity to offer a "satisfactory explanation" for the conflict between the prior deposition and the affidavit.  *Id.*

Here, Defendant has offered no "satisfactory explanation" for the conflict between Shaar's deposition testimony and the Sarver Affidavit.  Defendant's argument that Charlene Sarver was more knowledgeable about the Dialer than Shaar was, and that her affidavit should therefore take precedence over the 30(b)(6) deposition testimony, is not a "satisfactory explanation."  Rather, it flies in the face of Rule 30(b)(6).

Under Rule 30(b)(6), a defendant has "an obligation to prepare its designee to be able to give binding answers on [its] behalf."  *Ierardi v. Lorillard, Inc.*, No. 90-7049, 1991 WL

158911, at *3 (E.D. Pa. Aug. 13, 1991).  The testimony of the designee is deemed to be the testimony of the corporation itself.  *TIG Ins. Co. v. Tyco Int'l Ltd.*, 919 F. Supp. 2d 439, 454 (M.D. Pa. 2013).  Although a Rule 30(b)(6) deponent is not required to have personal knowledge of the noticed topics, she has a duty to prepare to speak on those topics, even if the preparation required to do so would be burdensome.  *Id.*; *see also Harris v. New Jersey*, 259 F.R.D. 89, 92 (D.N.J. 2007) ("The duty of preparation goes beyond matters personally known to the designee or to matters in which the designee was personally involved, and if necessary the deponent must use documents, past employees or other resources to obtain responsive information.").  Unless the defendant can "prove that the information was not known or was inaccessible, a corporation cannot later proffer new or different allegations that could have been made at the time of the 30(b)(6) deposition." *Rainey v. Am. Forest & Paper Ass'n, Inc.*, 26 F. Supp. 2d 82, 94 (D.D.C. 1998) (citing *Ierardi*, 1991 WL 158911, at *3).  "Were it otherwise, a corporation would be able to deceitfully select at trial the most convenient answer presented by a number of finger-pointing witnesses at the depositions."  *United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1996).

      Here, Defendant was obligated to designate someone who could testify on its behalf as to matters known or reasonably known to the organization.  Defendant designated Anita Shaar for this responsibility and no one else.  It cannot now disavow her testimony with a new affidavit from another employee, Charlene Sarver, with whom Shaar could have spoken with in preparation for the Rule 30(b)(6) deposition.[4]  Otherwise, Defendant would be able to "deceitfully select" the "most convenient answer" from various witnesses in order to avoid

---

[4]     Defendant also attempts to disavow Schaar's testimony relating to the Dialer by arguing that in her deposition, she admitted that she was not personally "involved with the placement of telephone calls or overseeing people who are placing telephone calls."  (Doc. 33, Def. Resp. to PSUMF, ¶ 31 (citing Doc. 24-5, Pl. Ex. D, Anita Schaar Dep. Tr., at 12:14-17; 17:2-15).)  However, as noted earlier, a Rule 30(b)(6) deponent's "duty of preparation goes beyond matters personally known to the designee or to matters in which the designee was personally involved."  *Harris*, 259 F.R.D. at 92.

summary judgment.  *Taylor*, 166 F.R.D. at 361.  Defendant is bound by Schaar's deposition testimony and cannot now disavow her testimony with the Sarver Affidavit.[5]

**E.      Telephone Consumer Protection Act**

Plaintiff also seeks summary judgment for his TCPA claim.  The TCPA is a "remedial statute that was passed to protect consumers from unwanted telephone calls." *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 271 (3d Cir. 2013).  "Because the TCPA is a remedial statute, it should be construed to benefit consumers."  *Id.*

The TCPA provides a private right of action for violations of subsection (b) or the regulations prescribed under that subsection.  An aggrieved consumer may recover either the actual monetary loss from such violations or statutory damages of Five Hundred Dollars ($500.00) for each violation, whichever is greater.  47 U.S.C. § 227(b)(3).  Courts may treble the amount of damages awarded if the defendant's violations were committed "willfully or knowingly."[6]

The TCPA prohibits calls to a cellular phone that are made "using any automatic telephone dialing system or an artificial or prerecorded voice" without "the prior express consent of the called party."  47 U.S.C. § 227(b)(1).  To establish her TCPA claim, Plaintiff must establish that Defendant (1) placed calls to his cellular phone using an automatic telephone dialing system or artificial or prerecorded voice (2) without Plaintiff's prior express consent.  *Estrella v. Ltd Fin. Servs., LP*, No. 8:14-cv-2624, 2015 WL 6742062, at *1 (M.D. Fla. Nov. 2, 2015).  Here, the only issues in dispute are (1) whether Defendant's Dialer constitutes an ATDS and (2) whether there was prior consent.

**1.      Automatic Telephone Dialing System**

An automatic telephone dialing system ("ATDS") is statutorily defined as

---

[5]      Curiously, and fatally, Defendant chose not to respond to, or even address, Plaintiff's argument regarding Defendant's obligations under Rule 30(b)6).

[6]      Plaintiff is not seeking summary judgment with respect to whether treble damages are appropriate.

equipment that has the "capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  47 U.S.C. § 227(a)(1).  The Federal Communications Commission ("FCC" or "Commission") has clarified that this ATDS definition "covers any equipment that has the specified capacity to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists."  *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, Soundbite Communications, Inc. Petition for Expedited Declaratory Ruling*, 27 F.C.C.R. 15391, 15392, ¶ 2 n.5 (Nov. 29, 2012) ("2012 FCC Order"); *see also In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, Request of ACA Int'l for Clarification & Declaratory Ruling, 23 F.C.C.R. 559, 566 ¶¶ 12-13 (Jan. 4, 2008) ("2008 FCC Order") (noting that "the basic function of [an ATDS] has not changed–the capacity to dial numbers without human intervention"); *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, Soundbite Communications, Inc. Petition for Expedited Declaratory Ruling*, 27 F.C.C.R. 15391, 15392, ¶ 2 n.5 (Nov. 29, 2012) ("2012 FCC Order"); *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, Report & Order, 18 F.C.C.R. 14014, 14092, ¶ 132 (July 3, 2003) ("2003 FCC Order") (same); *Estrella v. Ltd. Fin. Servs., LP*, No. 8:14-cv-2624, 2015 WL 6742062, at *1 (M.D. Fla. Nov. 2, 2015) ("The essential function of an ATDS is 'the capacity to dial numbers without human intervention.'") *Morse v. Allied Interstate, LLC*, 65 F. Supp. 3d 407, 410 (M.D. Pa. 2014) (holding that the debt collectors' system was an ATDS because "there was no human intervention at the time the calls were placed").  In July of 2015, the FCC reaffirmed its previous statements in clarifying the definition of "capacity," explaining that a dialing system will constitute an ATDS so long as it is capable of storing or producing and then dialing random numbers, "***even if it is not presently used for that purpose***, including when the caller is calling a set list of consumers."  *Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, Am. Ass'n of Healthcare Admin. Mgmt. Petition for Expedited Declaratory Ruling &

Exemption, 30 F.C.C.R. 7961, 7971-92 ¶¶ 10, 12-16, 19-20 (July 10, 2015) ("2015 FCC Order").[7]  *Id.*  The FCC has been petitioned to eliminate this broad definition of "capacity" and to instead limit the definition so that it would apply only to equipment that could place calls without human intervention.  However, the FCC refused.  *Id.* at 7974, ¶ 20.  The Commission has stated that, "even when dialing a fixed set of numbers, equipment may nevertheless meet the [ATDS] definition."  2015 FCC Order, at 7973, ¶ 12.[8]

Here, Plaintiff argues that the Dialer Defendant used to place calls to Plaintiff constituted an ATDS.  It is undisputed that phone calls are placed by Defendant's Dialer through the use of campaigns and that these campaigns are created by a human, namely, Charlene Sarver.  However, Defendant's corporate designee, Anita Scharr, testified that other than these campaigns, if a phone call is not answered by a debtor, there is no other human involvement:

> Q.   What does this mean?
> A.   A campaign is created --
> Q.   Right.
> A.   – which collects the phone numbers of accounts on our system.
> Q.   Um-hm.
> A.   And the Mercury dialer dials those numbers.
> Q.   Right.  ***So with the exception of creating the campaign that was going to select the accounts, was a human being involved at all in the placement of this phone call?***
> A.   ***No.***
> Q.   ***Is a human being involved in the placement of any phone calls made on the dialer, with the exception of creating a campaign?***
> A.   I – I don't know.  I don't think there's any other way to – ***no***.  The dialer does the dialing.
> Q.   Okay.  So a human being selects the campaign criteria but then the dialer actually places the phone call?

---

[7]     The 2015 FCC Order is not yet a final order due to a number of pending appeals, and is therefore not entitled to deference under the Hobbs Act.

[8]     The parties attempt to bifurcate the ATDS definition by suggesting that there are two (2) different tests for determining whether a system constitutes an ATDS: the "human intervention" test and the "capacity" test.  However, pursuant to the statute itself and the FCC Orders clarifying the statutory language, there must be a lack of human intervention element as well as an examination into whether the equipment has the capacity to store or produce and dial random numbers.  Therefore, I will conduct my analysis in accordance with these Orders.

A.    Correct.

Q.    Okay.  When does an employee of NRA first get involved in a phone call that's been placed?

A.    When someone answers the phone.

Q.    Okay.  So if an individual does not answer a phone call, an employee of NRA never is associated with that phone call?

A.    Repeat that question.

Q.    Sure.  If a phone call is not answered by a debtor, is an NRA employee ever involved in that phone call?

A.    No.

Q.    Okay.  So for this May 8, 2014, phone call, I believe you said the AD stood for was it answering detected or answering machine?

A.    Answering device, um-hum.

Q.    Okay.

A.    Voice mail.

Q.    So in that – for this call, was a human being involved at all from the time the call was placed to the termination of the phone call?

A.    No.

Q.    Okay.  And the only involvement at all was the creation of a campaign; is that correct?

A.    Correct.

(Doc. 24-5, Pl. Ex. D, Anita Schaar Dep. Tr., at 68:9-70:3 (emphasis added).)  Defendant offers no evidence that may be properly considered to refute this binding testimony from its corporate designee that there is no human involvement besides the creation of the campaign.

Rather, Defendant criticizes Plaintiff's reliance on Schaar's testimony, arguing that it fails to establish that the Dialer is an ATDS because Schaar "has no information about the technical aspects of the Dialer to 'prove' that the Dialer is an ATDS."  (Doc. 32, D Oppos., at 19, 22-23.)  Defendant then attempts to contradict this testimony with the Sarver Affidavit, which states that "[t]he Dialer is *not* capable of making phone calls without human intervention," and that "multiple levels of human intervention [are] required before the Dialer can make a phone call."  (Doc. 32-4, Def. Ex. 4, Sarver Affidavit, ¶¶ 10-11.)  For example, the Sarver Affidavit states that an individual collector is required to hit the "F4" key on a keyboard before any phone call is processed.  (Doc. 32-4, Def. Ex. 4, Sarver Affidavit, ¶ 17.)  Defendant argues that at least one (1) court has held that a phone system was not an ATDS where it had a "point and click" function that required the collection agent to press a button before the phone call could be made.  *See Estrella v. LTD Fin. Servs., LP*, No. 8:14-2624, 2015 WL 6742062, at *2-*3 (M.D. Fla. Nov. 2, 2015).

However, these excerpts from the Sarver Affidavit relied upon by Defendant directly contradict Schaar's Rule 30(b)(6) testimony excerpted above, where she testified that the only human involvement at all, prior to someone picking up the phone if the consumer answers, is the "creation of a campaign." (Doc. 24-5, Pl. Ex. D, Anita Schaar Dep. Tr., at 68:21-70:3.)  Therefore, Defendant cannot rely on this excerpt from the Sarver Affidavit to disavow the Schaar Rule 30(b)(6) deposition testimony, unless it can point to other corroborating evidence on this issue. *Jiminez*, 503 F.3d at 254.[9] However, Defendant points to no other evidence.  Accordingly, these excerpts of the Sarver Affidavit will not be admitted as evidence and Defendant's argument will be rejected.  The only evidence in the record relating to the extent of human involvement with regard to the Dialer is Anita Schaar's deposition testimony, which shows that unless a debtor answers the phone, the only human involvement relating to calls placed by the Dialer is the creation of the campaign, which "collects the phone numbers of accounts in [Defendant's] system," and the Dialer then "dials those numbers." (Doc. 24-5, Pl. Ex. D, Anita Schaar Dep. Tr., at 68:8-20.)  Schaar also testified that the Dialer has the capacity to dial random ten-digit numbers and that there are no restrictions on the system that would prevent a random number from being entered.  (*Id.* at 78:21-79:21.)  This is sufficient to demonstrate that the Dialer constitutes an ATDS.  The FCC has repeatedly explained that the statutory definition of ATDS covers any equipment that has the capacity to generate numbers and dial them without human intervention, "regardless of whether the numbers called are randomly or sequentially generated or ***come from calling lists***." 2012 FCC Order, 27 F.C.C.R. at 15392, ¶ 2 n.5; *see also* 2008 FCC

---

[9]       Additionally, even if I were to credit the Sarver Affidavit, the recitation of her "legal conclusion couched as a factual assertion" that "[t]he Dialer is not capable of making phone calls without human intervention" is insufficient to survive summary judgment. *See Dominguez v. Yahoo, Inc.*, 629 F. App'x 369, 373 (3d Cir. 2015) ("Not only does this restating of the statutory definition amount to nothing more than a legal conclusion couched as a factual assertion . . . it begs the question of what is meant by the word 'capacity.'").

Order, 23 F.C.C.R. at 566, ¶¶ 12-14 (rejecting argument that a predictive dialer constitutes an ATDS only when it randomly or sequentially generates telephone numbers, not when it dials number from customer telephone lists, and explaining that "the basic function of such dialing equipment has not changed–the capacity to dial numbers without human intervention").

Additionally, as explained by Judge Nealon, the proper inquiry revolves around whether there is any human intervention at the time a number is actually dialed, not simply before a call is placed and where a given set of numbers is entered:

> [T]he human intervention test of the 2003 FCC Order does not inquire as to whether there is human intervention at the entering of a "given set of numbers" or programming of the computer system, but rather if there is human intervention at the time a call is made/placed or when a number is actually dialed.

*Morse v. Allied Interstate, LLC*, 65 F. Supp. 3d 407, 410 (M.D. Pa. 2014); *see also Sterk v. Path, Inc.*, 46 F. Supp. 3d 813, 819 (N.D. Ill. 2014) ("The uploading of call lists from Path users is essentially the same as when a call list is entered by a telemarketer in a database.  It is the ultimate calling from the list by the automated equipment that is the violation of the TCPA.").  In *Morse*, campaigns of five thousand (5,000) numbers were uploaded to the dialer, which then placed calls from the list.  *Id.* at 410-11.

Likewise, here, the Defendant's corporate designee testified that the Dialer can perform these same functions.  There is no human intervention at the time the calls are placed.  Once the campaign is created or a client inputs random numbers into the system, the Dialer is automated and will dial the numbers on its own.  (Doc. 24-5, Pl. Ex. D, Anita Schaar Dep. Tr., at 78:18-79:24.)  Defendant has offered no evidence to contradict these facts, except for the Sarver Affidavit, which as explained above, cannot be used to contradict this testimony.  Accordingly, there is no evidence from which a reasonable juror could conclude that the Dialer does not constitute an ATDS under the TCPA.  Plaintiff will be entitled to summary judgment on his TCPA claim unless there is sufficient evidence for Defendant to establish a genuine issue of material fact over whether it is entitled to an affirmative defense.

28

### 2.    Express Consent

There are two (2) affirmative defenses to a TCPA claim:  (1) calls made for emergency purposes and (2) calls made with the "prior express consent" of the called party, both of which are absolute defenses to liability.  47 U.S. § 227(b)(1)(A); 2008 FCC Order, 23 F.C.C.R. at 564, ¶ 9 ("Although the TCPA generally prohibits autodialed calls to wireless phones, it also provides an exception for autodialed and prerecorded message calls for emergency purposes or made with the prior express consent of the called party.").  Here, Defendant asserts the defense of prior express consent.  Defendant bears the burden of establishing that this defense applies.  2008 FCC Order, 23 F.C.C.R. at 565, ¶ 10 ("Should a question arise as to whether express consent was provided, the burden will be on the creditor to show it obtained the necessary prior express consent.").  The FCC has "conclude[d] that the creditor should be responsible for demonstrating that the consumer provided express consent" because the creditor is "in the best position to have records kept in the usual course of business showing such consent, such as purchase agreements, sales slips, and credit applications."  *Id.* at 565, ¶ 10.  Although the FCC used the term "creditor," it "in no way indicated that its 2008 order distinguishes medical debtors."  *Mais v. Gulf Coast Collection Bureau*, 768 F.3d 1110, 1122 (11th Cir. 2014).  Although Defendant bears the ultimate burden of proof on the defense, Plaintiff, as the moving party, is required to "point[] out to the district court[] that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Here, it is undisputed that Plaintiff did not directly give Defendant express consent to call him.  (Doc. 25, PSUMF ¶ 25 (admitted in Doc. 33).)  However, Defendant argues that consumers can grant prior express consent without ***directly*** providing the debt collector his phone number.  Rather, Defendant asserts that consumers who provide their phone number in connection with an existing debt are deemed to have provided prior express consent to be called by debt collectors, and that so long as Plaintiff provided his phone number to Wilkes-Barre General Hospital in connection with his treatment there,

which resulted in the debt owed, and that phone number was then passed to Defendant

for collections, any consent was also "passed along."  In other words, the calls placed by

Defendant should be treated as if the creditor itself placed the calls.  *See, e.g.*, 2008 FCC

Order, 23 F.C.C.R. at 564, ¶ 9 ("Because we find that autodialed and prerecorded

message calls to wireless numbers provided by the called party in connection with an

existing debt are made with the 'prior express consent' of the called party, we clarify that

such calls are permissible."); *id.* at 564, ¶ 9 ("[P]ersons who knowingly release their

phone numbers have in effect given their invitation or permission to be called at the

number which they have given, absent instructions to the contrary.") (citation and internal

quotations omitted); *id.* at 565, ¶ 10 ("Calls placed by a third party collector on behalf of

that creditor are treated as if the creditor itself placed the call."); *Mais*, 768 F.3d at 1122

("Plainly, [Plaintiff's] wife made his number available to Florida United by granting the

Hospital permission to disclose it in connection with billing and payment."); *Wattie-Bey v.*

*Stephen & Michaels Assocs., Inc.*, No. 1:13-cv-396, 2014 WL 123597, at *3 (M.D. Pa.

Jan. 14, 2014) (finding a genuine issue of material fact relating to "prior express consent"

to preclude the plaintiff's motion for partial summary judgment where the plaintiff provided

his cellular number to T-Mobile when he opened an account with them, and was then

called by a collection agent for T-Mobile).

　　　　Relying on these cases and FCC Orders, Defendant argues that since Plaintiff

gave his phone number during the transaction that resulted in the debt owed, *i.e.*, the

medical services, and that number was eventually given to NRA for collections (albeit

through intermediary parties), it had prior express consent to call Plaintiff's number.

(Doc. 33, Def. Resp. to PSUMF, ¶ 24.)  Defendant is correct that "prior express consent"

can be established even when the plaintiff did not **directly** provide consent to the

defendant debt collector.  If Defendant could adduce sufficient evidence to establish that

Plaintiff provided express consent to either Radiology Associates or Wilkes-Barre

General Hospital in connection with his treatment there, under certain circumstances, that

express consent could be indirectly passed on to debt collectors seeking to collect on

debt relating to Plaintiff's treatment there.  *See generally Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110 (11th Cir. 2014).  However, Defendant failed to do this.

In *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110 (11th Cir. 2014), the plaintiff sought emergency room treatment from a hospital and in connection with his treatment, his wife completed and signed admissions documents on his behalf, which she gave to a hospital representative.  *Id.* at 1113.  She provided the admitting nurse with demographic and insurance information, including her husband's cellular phone number. *Id.*  By signing a Conditions of Admission form, she acknowledged receiving the hospital's Notice of Privacy Practices and expressly agreed that "the hospital and the physicians or other health professionals involved in the inpatient or outpatient care [may] release [Plaintiff's] healthcare information for purposes of treatment, *payment* or healthcare options,' including 'to any person or entity liable for payment on the patient's behalf in order to verify coverage or payment questions, or for any other purpose related to benefit payment.'" *Id.* at 1113-14.  Upon being admitted to the hospital, the plaintiff received radiology services from Florida United, a hospital-based provider.  He incurred a medical debt of approximately Fifty Dollars ($50.00).  *Id.* at 1114.  McKesson, a billing company serving as Florida United's agent, electronically retrieved the plaintiff's telephone number from the hospital and billed him.  *Id.*  When the plaintiff did not pay his debt, McKesson forwarded his account to Gulf Coast, the defendant, for collection pursuant to a written agreement between Gulf Coast and Florida United's parent company, Sheridan.  *Id.*  Gulf Coast is a debt collector that uses a predictive dialer to place phone calls through automated technology.  *Id.*

The Eleventh Circuit reversed the district court's order granting partial summary judgment for the plaintiff and remanded with instructions to enter final summary judgment for the defendant because under these undisputed facts, the defendant was entitled to the prior express consent defense.  *Id.* at 1113, 1121-26.  Specifically, The Eleventh Circuit held that "by granting the Hospital permission to pass his health information to Florida United for billing, [the plaintiff's] wife provided his cell phone number to the

31

creditor, consistent with the meaning of prior express consent announced by the FCC in its 2008 Ruling.  Gulf Coast is entitled to summary judgment precisely because the calls to [the plaintiff] fell within the TCPA prior express consent exception as interpreted by the FCC."  *Id.* at 1126.

Therefore, Defendant is correct that express consent can be found even where the plaintiff did not *directly* provide consent to the defendant.  However, it must be shown that the plaintiff had given express consent to someone at some point.  Defendant has failed to adduce sufficient evidence to establish this.  Unlike in *Mais* where it was undisputed that the plaintiff provided express consent to the hospital by completing admissions forms, which included providing her husband's cell phone number and signing a notice whereby she expressly agreed that the hospital could release the plaintiff's healthcare information for purposes of treatment or payment, there is no evidence anywhere in the record here showing that Plaintiff provided express consent to Radiology Associates or Wilkes-Barre General Hospital, or any other entity for that matter.  There is no evidence that Plaintiff provided his cell phone number to anyone or that he signed any admissions or release forms like those in *Mais*.  There is only Defendant's uncorroborated assertion that Plaintiff "must have" done so:

> Plaintiff received certain medical services from [Radiology Associates] as part of his treatment at the Wilkes-Barre General Hospital.  If Plaintiff did not provide his phone number to [Radiology Associates] he must have provided it to Wilkes-Barre General when he first checked in for treatment.  Since MBMS was provided Plaintiff's telephone number when it received his radiology report, it follows that the phone number Plaintiff provided to Wilkes-Barre General was the same number that was provided to MBMS and ultimately to NRA.

(Doc. 33, Def. Resp. to PSUMF, ¶ 24.)  Although Defendant has submitted some evidence through the MBMS Affidavit to show that it received Plaintiff's phone number from MBMS, who received Plaintiff's phone number from *either* Radiology Associates or Wyoming Valley Health Care System ("WVHCS") (it is apparently unknown), and that none of these entities conducted any independent investigation to discover Plaintiff's phone number, the critical missing link is evidence that *Plaintiff* provided any of these

entities with his phone number.  (*See generally* Doc. 32-2, Def. Ex. 2, MBMS Affidavit.)

To the contrary, Plaintiff declared in his affidavit that he never gave his phone number to

Radiology Associates.  (Doc. 24-4, Ex. C, John Daubert Affidavit, ¶ 6.)  There is no

evidence to dispute this or to suggest that he gave his phone number to WVHCS or any

other entity.  This missing link is fatal to Defendant's prior consent defense.[10]

Because Plaintiff has provided evidence of an absence of consent and because

Defendant has failed to adduce any evidence that would allow a reasonable juror to

conclude that Plaintiff expressly consented to receive such calls, there is no genuine

issue of material fact with regard to prior express consent that could preclude summary

judgment in Plaintiff's favor.  *Hines v. CMRE Fin. Servs., Inc.*, No. 13-61616, 2014 WL

105224, at *4 (S.D. Fla. Jan. 10, 2014) (granting summary judgment for the plaintiff for

this same reason).

### III. Conclusion

For the above stated reasons, Plaintiff's Motion for Partial Summary Judgment will

be denied with respect to his FDCPA claim and granted with respect to his TCPA claim.

An appropriate order follows.

May 27, 2016          /s/ A. Richard Caputo
Date                          A. Richard Caputo
                                 United States District Judge

---

[10]      It also does not help that Defendant did not do any investigation to determine how
         Radiology Associates obtained Plaintiff's phone number and that Defendant does
         not require their clients to guarantee they had consent to call to begin with.  (Doc.
         24-5, Pl. Ex. D, Anita Schaar Dep. Tr., at 59:2-8; 80:23-81:21.)